# IN SPECIAL TERM, 1872.

WILLIAM C. SMOCK *v.* WM. HENDERSON, JAMES O. WOOD-
RUFF, DELOSS ROOT, WILLIAM BRADEN,
THOS. A. HENDRICKS.

A demurrer to evidence admits all facts, and conclusions which the evidence
conduces to prove. The court, in considering the demurrer, must be
liberal in its inferences in favor of the plaintiff, and must consider
every fact as proved which a jury might legally, and reasonably have
inferred in his favor, avoiding, however, all forced, or violent infer-
ences.

Where it is shown that a certificate of stock in an incorporated company has
been assigned, and after its assignment it was surrendered to the com-
pany, and other certificates issued for the same stock, to no greater
amount than the stock surrendered, in the absence of any proof to the
contrary, it will be presumed that the stock was surrendered with the
assent of those to whom it was assigned.

A transfer of shares of stock in an incorporated company, without assign-
ment upon the books of the company, is good as between the parties.

The provision requiring a transfer of stock on the books of a corporation, is
for the benefit of the corporation, but if the corporation assent to a
transfer otherwise than on the books, and by such transfer the persons
to whom the stock is transferred become stockholders, the corporation
can not object, nor can the stockholder, as long as he is in fact a stock-
holder.

Evidence showing that the holder of a certificate of stock in an incorporated
company has never been denied any privilege as a stockholder, and
that there has never, at any time, been certificates of shares outstanding
to an amount greater than the authorized capital stock, and that the
shares held were issued in lieu of a certificate of shares surrendered
will not sustain a charge of over issue of stock.

Under the act of the Legislature "to authorize the construction of water
works," (Acts of Reg. Session 1865, p. 103), it was not necessary that
the whole, or any amount of stock should have been taken, before the
organization was completed, and not being required by the act itself,
there is no other rule of law requiring it.

Under the act authorizing its organization, the water works company could

8

take the Central Canal by purchase, and issue stock in payment therefor, but the amount so issued to be consistent with honesty of purpose, should be reasonably proportionate to the value of the canal. .

The fact that the canal purchased, and owned by the Water Works Company has no value, does not show that the stock in the corporation is without value.

Stock to the amount of $500,000, the full amount authorized to be issued by the Water Works Company, was issued on receiving a conveyance of the Central Central. One-half of this amount of stock was received by the stockholders of the Canal Company, the consideration named in the deed conveying the canal was $200,000, and by the terms of the agreement of purchase the other half was to come back, and did come back to the defendants for their own use:

*Held:* That the defendants, and the stockholders in the Canal Company, being the owners of the stock, and parties to the agreement under which it was issued, as long as they held the stock themselves no one could be injured but themselves, by reason of the transaction reducing the value of the stock.

The fact that it is stated on the face of a certificate of stock, "*paid* in full of the value of fifty dollars per share," shows that the shares are not liable to further calls. It can not be held to mean that the corporation has money, or property equal in value to the par value of the stock, and is not a representation that can be relied on by a purchaser as indicating the value of the stock.

Fraud may be shown by reason of false representations made by a seller to induce a purchaser to buy shares of stock.

But in the absence of any false representations by which a purchaser is induced to buy shares of stock in an incorporated company, although the stock may have been depreciated in value before the purchase by the acts of parties managing the business of the corporation, the purchaser can not recover against such parties.

*Dye & Harris,* for plaintiff.

*Hendricks, Hord & Hendricks, Porter, Harrison & Hines,* for defendants.

BLAIR, J.—The complaint in this case contained five paragraphs. To the first, and third paragraphs demurrers were sustained, and these need not now be considered.

The second paragraph is, in substance, as follows: That the Water Works Company is a corporation, duly organized

under the laws of Indiana; the amount of stock subscribed was only six hundred dollars, no part of which has ever been paid, and no certificates of stock were ever issued therefor; that in June, 1870, the defendants were directors of said corporation, and as such directors, in violation of their legal duty, and without any payment, or subscription of stock, and without any consideration moving to the corporation, wrongfully, and unlawfully issued certificates of stock in said corporation, to the amount of $500,000, to one Harmon Woodruff, and to themselves, and recited on the face of the certificates that the stock had been paid in full, when in fact nothing had been paid, and the certificates represented no real value, and were issued with a fraudulent intention of selling them in the market for a value they did not possess; that the plaintiff purchased certificate number twenty-five, for one hundred and sixty shares of fifty dollars each, of said stock, believing the same to represent paid up capital of said corporation, when in fact it did not represent any capital stock, paid, or unpaid; that he paid therefore the sum of four thousand dollars, and it is of no value: wherefore the plaintiff says he has been damaged.

The fourth paragraph charges that the defendants, as directors, while certificates of stock to the full amount for which they were authorized to issue stock were outstanding, issued other certificates of stock, one of which, for one hundred and sixty shares, was issued to the plaintiff, for which he paid four thousand dollars, believing the same was a genuine, and legal certificate: wherefore he says he has been damaged, etc.

The fifth paragraph, after alleging the organization of the company, and the subscription of stock, as in the second paragraph, and that it was never paid in, nor certificates issued therefor, charges that afterwards, the defendants made an agreement with Harmon Woodruff, and others, which agreement is made a part of the complaint. The agreement

was made on the 17th day of May, 1870, and is between the Indiana Central Canal Company, by Harmon Woodruff, Benj. Gould, and Henry R. Seldon, agents of said Canal Company, of the first part, and the defendants, William Braden, Deloss Root, Thomas A. Hendricks, William Henderson, and James O. Woodruff, of the second part, and it is agreed therein:

*First.* That the Canal Company should convey to the Water Works Company of Indianapolis that part of the Indiana Central Canal north of Morgan county, including all appurtenances, leases, etc., thereto belonging.

*Second.* The Water Works Company was to accept the conveyance of the Canal "in full payment, and satisfaction for five hundred thousand dollars in amount of its capital stock, (being the full amount of stock which it is entitled to issue,) and shall deliver to the party of the first part certificates of full paid stock, not subject to further call for such five hundred thousand dollars, in such amounts as shall be required by the party of the first part." The Water Works Company also to assume the responsibility of suits pending in favor of, or against the Canal Company, or any of the members thereof, growing out of the property, or business thereof, etc.

*Third.* If any further issue of stock is made by the Water Works Company, the stockholders to have the privilege of taking the same, etc.

*Fourth.* The Water Works Company to execute to William Henderson, and James M. Ray, as trustees, a mortgage upon the whole of the property conveyed to said company, conditioned as security for the payment of the bonds of said company, to the amount of three hundred and fifty thousand dollars, payable in not less than twenty years, and bearing interest at the rate of eight per cent. per annum, payable half yearly, the principal, and interest to be payable in gold.

*Fifth.* Twenty thousand dollars in amount of said bonds

to be delivered to the Canal Company " for the purpose of satisfying its indebtedness," to be delivered on satisfaction of a certain mortgage lien upon the canal property being entered of record.

*Sixth.* The parties of the second part (the defendants) to receive the remaining three hundred and thirty thousand dollars of bonds, and apply the same, or the proceeds of the sale thereof, " at the rate of ninety cents on the dollar of the nominal amount thereof, to the construction, and putting in operation of water works in the city of Indianapolis, according to the terms of an ordinance authorizing such construction, etc." The said parties to superintend the application of said moneys to the work, under the general direction of Mr. Holly, of the Holly Manufacturing Company—the work to be done promptly, and at cash prices for labor, materials, etc. The bonds to be deposited with the trustees, and to be issued to the parties of the second part, as the work progresses, on the certificate of the Holly Manufacturing Company as to the amount expended, the amount issued not at any time to exceed the amount expended, until the whole ninety per cent. of the three hundred and thirty thousand dollars shall have been expended, when the balance shall be issued.

*Seventh.* The Canal Company to convey, as soon as it may be issued, ten thousand dollars in amount of the capital stock of the Water Works Company to the parties of the second part, and to place two hundred and forty thousand dollars in amount thereof in the possession of William Henderson, James M. Ray, trustees, to be delivered to the parties of the second part, as follows: Fifty thousand dollars of stock for each seventy thousand dollars certified to have been expended in the construction of water works, and fifty thousand dollars of stock for each additional seventy thousand dollars so expended, until the whole ninety per cent. of the bonds issued shall have been expended, when the residue of the stock shall be delivered.

*Eighth.* The parties of the second part to pay the interest on the bonds out of the proceeds of the sale of the bonds, or so much thereof as shall not be otherwise paid, until the income of the works is sufficient to pay the same.

The plaintiff then further charges, that the canal conveyed to the Water Works Company in pursuance of the agreement was wholly without value, as the defendants, and Harmon Woodruff well knew; that the Canal Company held only an easement in the real estate through, and over which the canal flowed; and that the right, and franchise of the Canal Company could not be legally transferred to the Water Works Company, nor could the Water Works Company, by, or under its charter, take, or hold the rights, or franchise of the Canal Company; and if the same could have passed by a conveyance to the Water Works Company, it was useless, and unnecessary to accomplish the purpose for which the company was organized; and could not be used by the same; that the canal was encumbered by leases of water beyond its ability to supply, and had no real value, which the defendants well knew, but that they made the agreement with the fraudulent purpose, and intention of creating a fictitious capital of the pretended amount of five hundred thousand dollars of said Water Works Company, and dividing the same among themselves, issuing certificates of stock therefor, and selling them as paid up capital stock of said company for a value they did not possess; that the defendants, after making the agreement, being directors of the Water Works Company to carry out the fraudulent purpose above set forth, elected the defendant, James O. Woodruff, President of said company, and constituted him their agent to issue the certificates of stock, and Woodruff, with the knowledge, and consent of the other defendants, issued the certificates, reciting on the face of the same that they had been paid in full, and purported to represent actual capital stock of said company; that certificate number

twenty-five, for one hundred and sixty shares, was issued to the plaintiff, and he purchased the same, believing that it represented, as it purported, paid up capital stock of said corporation, whereas it was fraudulently issued as aforesaid, and represented no capital stock, paid, or unpaid, and the money paid by the plaintiff for said certificate was not paid to, or received by the Water Works Company, and the stock so purchased by the plaintiff was, by reason of the fraudulent acts of the defendants, without value: wherefore plaintiff says he has been damaged, etc.

The defendant, James O. Woodruff, files his answer in general denial, and the other defendants join in an answer denying the matters alleged in each paragraph of the complaint.

The cause was submitted to a jury for trial, and after the plaintiff had closed his evidence, the defendants filed a demurrer to the same, and the right of the plaintiff to recover is now presented upon the demurrer.

It will be most convenient first to consider how far the the evidence supports the facts alleged in the complaint. The defendants having demurred to the evidence, the Court must be liberal in its inferences in favor of the plaintiff, and must consider every fact as proved which the jury might have legally, and reasonably inferred in his favor, avoiding, however, all forced, or violent inferences. The demurrer admits all facts, and conclusions which the evidence conduces to prove. *McCreary* v. *Fike*, 2 Blackf., 374; *Doe* v. *Roe et al*, 4 Blackf., 263.

Following the above rule, we find from the evidence that the Water Works Company was organized as stated in the complaint. That originally there was a subscription of stock to the amount of six hundred dollars, and this was all the stock ever subscribed. No portion of the stock subscribed was ever paid in, nor was any certificates of stock ever issued for the amounts subscribed. That the defend-

ants were directors of the corporation at the time alleged in the complaint. That the defendants, in their personal capacity, and not as directors of the Water Works Company, made the agreement set out in the fifth paragraph of the complaint with the Canal Company, by her agents, Harmon Woodruff, and others, on the 17th day of May, 1870. That the Canal Company, in pursuance of the agreement, conveyed the canal to the Water Works Company, by a deed of date the 1st day of May, 1870. That the Water Works Company, by her Board of Directors, accepted the canal in full payment, and satisfaction for five hundred thousand dollars in amount of her capital stock, that being the full amount which she was allowed to issue, and the defendants, as directors, caused certificates of stock to that amount to be issued. Certificate of stock No. 1 was issued on the 7th day of June, 1870, to Harmon Woodruff. This certificate was for five thousand shares of fifty dollars each, amounting to two hundred and fifty thousand dollars. On the same day, certificates numbered two to six, inclusive, were issued, conveying to each of the defendants forty shares, amounting in all to ten thousand dollars. Also, on the same day, certificate number seven was issued, conveying to Harmon Woodruff four thousand eight hundred shares, amounting to two hundred and forty thousand dollars. On the 13th day of June, 1870, certificate No. 1 was assigned by Harmon Woodruff to the various stockholders of the Central Canal Company, and the certificate was returned for cancellation to the Water Works Company on the 17th day of June, 1870, was canceled, and other certificates issued in lieu thereof, to divers persons, among which was the certificate to the plaintiff. At the time certificate No. 1 was returned, a list of stockholders of the Canal Company, and persons to whom stock was to be issued, was furnished to the Secretary of the Water Works Company, and the stock was issued according to the list. From the 6th of

September, 1870, to April 22d, 1871, certificates of stock were issued to different persons, including large amounts to each of the defendants, in lieu of certificate No. 7, originally issued to Harmon Woodruff. This was the stock amounting to two hundred and forty thousand dollars placed by the Canal Company in the hands of trustees, to be delivered to the defendants as the work progressed, according to the agreement. The plaintiff purchased certificate No. 25, of James O. Woodruff, President of the Water Works Company. The contract of purchase was made on the 26th of May, 1870, and a part of the money paid therefor, but the certificate was not issued and received by the plaintiff until the 17th of June, and the plaintiff paid for the one hundred and sixty shares of fifty dollars each the sum of four thousand dollars. The certificate recites that "William C. Smock is the owner of one hundred and sixty shares of the capital stock of the Water Works Company of Indianapolis, paid in full of the value of fifty dollars per share."

The preliminary negotiations for the purchase of the stock were made through Daniel Macauley, who called on Mr. Smock and said he could procure him some stock. Mr. Smock gave Macauley a check for Mr. Woodruff for a part of the money. The plaintiff saw Mr. Woodruff at the office of the Water Works Company, for the first time, when he received the certificate from him. He then asked Mr. Woodruff some questions about the company, and he showed the plaintiff a map containing the proposed lines of pipes, and told what had been done, and how much was proposed to be done in a given time. The plaintiff asked where the funds were to come from, and was informed by Mr. Woodruff that $100,000 had been borrowed to put down mains. The plaintiff says he had no conversation with Woodruff, or any of the defendants, with reference to the manner in which the stock was paid. He was not a stockholder in the Canal Company, and did not know for some months after the pur-

chase of stock that the canal was conveyed, and was a part of the stock of the Water Works Company. No part of the money paid by the plaintiff for the stock passed to the Water Works Company. The canal, at the time of the conveyance to the Water Works Company, was worth nothing as an investment. With its incumbrances of leases, etc., it was without value in the market. For a series of years prior to that time, the expenses of keeping it up exceeded the income from water rents. It was incumbered with leases of water power. On what is called the upper level, in the city, the leases of power greatly exceeded the capacity of the canal for a large portion of each year. When there is a supply of water on the upper level, there is a surplus sufficient for some four and one-half run of stone on the lower level. The water works are located on the lower level, and have been using the water there, and the surplus of four and one-half run is sufficient to supply the ordinary demand in running the pumps, but not sufficient for fire purposes. The water rents for 1870 amounted to near ten thousand dollars. If the Water Works Company use water power equal to three run of stone, there would be a saving of nine or ten thousand dollars in running a whole year by using water instead of steam. If they could not rely upon it in case of fires, or the supply of water should at times be short, the difference would be lessened, and as the company in such case would be compelled to keep her engines in order, and have an engineer at hand, the difference would be reduced by such expenses. The water power afforded by the canal is uncertain, owing to the rise and fall of water in the river, and the liability to breaks in the canal and dam. Great expense has often been incurred on account of breaks. From the great difference in the expense of running machinery by water power and by steam, and the value of the water rents, the evidence shows that the canal is not entirely without value to the Water Works Company. As

an investment by itself, for the purpose of profit, it is without value; but for the purpose of propelling machinery, it may be used with profit by the Water Works Company. The defendants had full knowledge of the value of the canal at the time the contract was made, the deed accepted, and the stock issued therefor. Other matters in evidence will be considered in connection with the legal rights of the parties involved in the case.

The first question presented by the plaintiff in argument, and in the brief furnished the Court, is that of over-issue of stock, as presented in the fourth paragraph of the complaint. It is claimed that as certificate No. 1, for stock to the amount $250,000, was issued to Harmon Woodruff, the President of the Canal Company, and was by him assigned to the various stockholders of the Canal Company, on the 13th day of June, 1870, that this vested in them the stock, and " it could not be divested without the consent of such owners, and the issue of new certificates to other parties than the owners, or their assignees, would be an over issue; it would not change the vested ownership of the stock already allotted and owned; it would confer no rights on the party to whom it was issued, etc."

It is true that the stock issued to the plaintiff was a part of the stock shown to have been assigned to the stockholders in the Canal Company, and no assignment from any of the stockholders to the plaintiff is shown to have been made; but as it is shown that certificate No. 1, after the assignment to the stockholders of the Canal Company, was surrendered to the Water Works Company on the 17th day of June, before the shares were issued to the plaintiff, in the absence of any proof to the contrary, it will be presumed that it was surrendered with the assent of those to whom it had been assigned, and in whom it was then vested.

But it is urged that it was only returned to have the stock transferred on the books of the company to the owners—that is, to the stockholders in the Canal Company.

The evidence shows that after the certificate No. 1 was surrendered, other certificates in lieu thereof were issued by the Water Works Company, in amount equal to, and no more, than the amount of shares in the surrendered certificate, and among the certificates so issued was the certificate No. 25 to the plaintiff, and the plaintiff was not a stockholder in the Canal Company. It is not shown, however, that any stockholder of the Canal Company has ever claimed the shares issued to the plaintiff, or that they were wrongfully issued to him, and as a transfer of shares, without assignment upon the books of the company, is good between the parties, it seems to me that it may well be inferred that some stockholder in the canal made a transfer of his shares to the plaintiff. The provision requiring a transfer of stock on the books of a corporation, is for the benefit of the corporation; but if the corporation assent to a transfer otherwise than on the books, and by such transfer persons to whom stock is transferred become stockholders, the corporation can not object, nor can the stockholder so long as he is really *de facto* a stockholder. *Conant et al* v. *Reed et al*, 1 Ohio St., 298; *Mandelbaum* v. *North American Mining Company*, 4 Mich., 465; *Bargate* v. *Shortridge*, 31 E. L. & Eq., 44.

It does not appear that the plaintiff has ever been denied any privileges as a stockholder, or that there has ever been, at any time, certificates of shares outstanding to an amount greater than the authorized capital stock, and it being shown in evidence that the shares issued to the plaintiff were issued in lieu of a certificate for shares surrendered, the evidence does not support the charge of an over-issue of stock.

Under the second paragraph of the complaint, it is urged that the deed from the Indiana Central Canal Company to the Water Works Company was void, and conferred on the Water Works Company no rights, and hence there was no consideration for the stock issued.

It is true that if the directors of a corporation expend the

capital stock, or the assets of a corporation, in the purchase of property which those of whom they purchase have no right to convey, and can not legally convey, and do not convey so as to vest any property in the purchasers, the stockholders, those who own the stock and assets of the corporation, would be damaged by such transaction, and an action would lie against the directors for their act, by which the assets of the corporation had been wrongfully squandered and lost to the stockholders.

The acts of a corporation in violation of its charter are not, however, in all instances necessarily void. A corporation may by such acts sometimes acquire title to property, and transmit it to others. *Farmers' & Millers' Bank of Milwaukee* v. *Detroit & Milwaukee R. R. Co.,* 17 Wis., 372; *Bissell* v. *Michigan Southern R. R. Co.,* 22 N. Y., 258; *Parish* v. *Wheeler,* Ib., 494.

To determine the power of the Canal Company to convey the canal and franchise of the Water Works Company would require a careful investigation, which I do not deem necessary to enter upon in this case. The stockholders in the Canal Company seem to have acquiesced in the bargain made by their agents and officers, and accepted the pay for for the canal. They can not, therefore, complain. They have got all they bargained for, and with a knowledge of the facts, ratified the sale by voluntarily accepting the proceeds. We are not apprised that any complaint is made, or proceedings threatened on behalf of the public, that conferred on the Canal Company the privileges, or franchises possessed by the company. It is not shown but that the Water Works Company got all that was attempted or proposed to be conveyed by the Canal Company; but on the contrary it is shown that the Water Works Company is using the water power derived from the use of the canal, and for aught that appears she is in undisturbed possession under a claim of title and ownership. Again, the bargain was made, the con-

veyance of the canal accepted, and the stock issued according to the agreement, before the plaintiff became a stockholder; hence he was not injured by the transaction, not having any interest in the Water Works Company at the time of the transaction that could be injured.    Whether the transaction was so tainted with fraud as to give him a right of action will presently be considered.    For these reasons, I conclude that it is not necessary further to inquire whether the Canal Company had a right to convey the canal or not, but for the purposes of this case, as far as it affects the rights of the plaintiff, we must consider the conveyance as having passed the canal to the Water Works Company.

We come then to consider the evidence and law in connection with the fifth paragraph of the complaint.

The act of the Legislature " to authorize the formation of companies for the construction of water works in, and for incorporated cities," (act of Regular Session 1865, p. 103,) under which the Water Works Company was organized, is extremely liberal in its provisions, but lacks some of the provisions usually contained in acts authorizing the organization of corporations of so much importance to the public. It is only necessary that any number of persons, not less than twelve, shall make and acknowledge a certificate showing the corporate name they propose to assume, the amount of capital stock, the term of existence not exceeding fifty years, the number of directors, and their names for the first year, and the name of the city where the business is to be carried on ; and after causing the certificate to be filed, and recorded in the office of the recorder of the county, the persons who have signed the same, and their successors, " shall be a body politic and corporate, and by their corporate name may take, hold, and convey all such real estate as shall be necessary to carry on the operations, and effect the objects and purposes of the company, &c."    The act contains no provisions requiring a certain, or any amount of stock to be taken,

or subscribed for, before becoming a corporation, nor any pro-vision as to how, or in what quantities, or in what manner the stock taken shall be paid in.   A person proposing to purchase stock would learn nothing, therefore, of the standing of the company, or the value of its stock, by looking at the provi-sions of the act authorizing the organization, and seeing what must have been complied with.   He must look alone to the acts of the company after its organization, to see what has been done, and what the stock is actually based upon, in order to estimate its probable value.   It was not necessary, under the act, that the whole, or any amount of stock should have been taken before the organization was completed, and not being required by the act itself there is no other rule of law requiring it.   *Minor* v. *Mechanics' Bank of Alexandria,* 1 Pet., 46.

It is claimed by the plaintiff that the agreement made by the defendants with the Canal Company, and their accepting the conveyance of the canal on the terms agreed upon, issuing therefor the entire capital stock of the Water Works Company, the certificates purporting, and representing on their face that the shares are "paid in full of the value of fifty dollars per share," and thus putting them upon the market, is evidence of a fraudulent combination of the defendants to deceive purchasers of the shares, and gives the plaintiff a right of action.

I have given this branch of the case careful attention, and investigation.   It is apparent from the evidence now before the Court, that if the canal possessed any value, it was very small in comparison with the amount of stock issued upon its basis.   The Water Works Company doubtless could take the canal by purchase, and issue stock in payment for it, but the amount so issued to be consistent with honesty of purpose on the part of the corporation, should be reasonably proportionate to the actual value of the canal.   The agree-ment itself under which the canal was purchased, and the

stock issued, casts such grave suspicion upon the transaction that a court, when appealed to, would look carefully to the rights of all the parties then interested, if there were any who did not assent to it, and who might be injured by it. In fact it can hardly be claimed that it could be sustained against such parties on any principles consistent with perfect good faith.

The consideration named in the deed of conveyance, by which the canal passed to the Water Works Company, was two hundred thousand dollars. This was certainly far above any value that the canal, under any view of the plaintiff's evidence, (which is all that is before the Court, and for the purposes of this case the demurrer admits to be true,) can be found to possess. It is proper, however, in this connection to say, that the fact that the canal owned by the Water Works Company has no value, does not necessarily show that the stock in the corporation is without value. *Gifford* v. *Carvell*, 29 Cal., 589.

Stock to the amount of five hundred thousand dollars was issued on receiving the conveyance of the canal. Of this the stockholders in the canal received two hundred and fifty thousand dollars, and by the terms of the agreement the defendants were to receive two hundred and fifty thousand dollars, ten thousand dollars when it was first issued, and the remaining two hundred and forty thousand dollars in portions as the construction of the water works progressed. Thus one-half of the stock originally issued was, by the terms of the agreement, to come, and did come back to the defendants, who authorized its issue. It did not come back to the Water Works Company, to be cancelled, and the stock reduced to that amount, but to be appropriated by the defendants to their own use.

The evidence in the case shows, however, that the certificates of stocks issued to the defendants, Hendricks, and Henderson, are still in the possession of the officers of the company.

It was urged for the defendants, that the obligations they assumed, in the agreement of applying the proceeds of the sale of the bonds " at the rate of ninety cents on the dollar of the nominal amount thereof to the construction, and putting in operation of water works," superintending the same, and seeing that the money was faithfully, and economically applied, is a sufficient consideration to support the transfer of the stock to them.   I do not think this view can be fully sustained.   There is, of course, no evidence before the Court of the value to the stockholders of the guaranty thus made by the defendants, that the mortgage bonds should net ninety cents on the dollar, the defendants would, by the terms of their agreement, have to make up the difference. The difference might amount to an important sum of money; it might be an insignificant amount, or none at all.   As directors, they were under no obligations to make the guaranty, and for making it they had a right to stipulate for a compensation mutually satisfactory to the parties interested. With the exception of the guaranty, most, if not all of the obligations assumed in the agreement, would devolve on them in their character as directors and trustees of the stockholders.   As such, it was their duty to see that the proceeds of the bonds were honestly, faithfully, and economically applied to the purposes of the corporation, and the interests of the stockholders carefully guarded.   Directors of a corporation organized for the purpose of making money, are not usually entitled to a compensation for their ordinary services.   Angell & Ames on Corp., § 317.

If to be compensated, however, the pay should be reasonably proportioned to the services rendered, and the financial ability of the corporation.   To take one-half of the capital stock could not be held reasonable, nor do I think even the guaranty made by the defendants makes such an amount reasonable.   If the plaintiff had been an original subscriber to the stock of the company, or had owned his stock at the

. time of this transaction, there would be no question but that he would have been damaged, and for the wrongful act of the defendants, by which the value of his stock would have been lessoned, or destroyed, they would have been liable.

But who was injured by this large issue of stock for which the corporation received but little value? There were no stockholders, until the stockholders in the Canal Company and the defendants became such by the issue of the stock. They were all parties to the agreement, all participated in the transaction, all agreed to the terms and basis upon which the stock issued. No one of these stockholders could complain that the others had cheated him. They all equally participated in the process, by which the actual value of the stock was placed at a very low figure, and its nominal value very high. They being the owners of all the stock, no outsider was damaged, and as long as they held the stock themselves, no one could be injured by reason of the stock being of value much under par. It is true that the plaintiff seems to have bargained for the stock before any stock was issued, but it was after the agreement with the Canal Company was made, while the agreement was being executed by the parties, and the purchase was not perfected until after all the stock had been issued, two hundred and fifty thousand dollars of it, to Woodruff, and by him assigned to the stockholders of the Canal Company, and by them surrendered for cancellation. It is claimed by the plaintiff that the agreement, and the entire transaction show a combination on the part of the defendants, to issue the stock, on the basis it was issued, thus creating a fictitious capital, and sell it in the market, as paid up stock, for a value it did not possess. There is no evidence showing that any stock had been pushed upon the market; nor do I regard such evidence as material.

Certificates of stock in an incorporated company are not negotiable instruments. They do not pass as negotiable notes, or bills of exchange. They are' mere muniments of

Smock *v.* Henderson *et al.*

title, showing that the owner is entitled to participate in the dividends, and profits of the corporation, in proportion to the number of shares he owns of its capital stock. The fact that it is represented on the face of the certificate as paid up stock, shows that the shares are not liable to further calls. It can not be held to mean that the corporation has money, or property equal in value to the par value of the stock. Even if money amounting to the full face of the shares had been paid into the corporation to-day, it might be expended for something of no value to-morrow, or squandered in many ways by improvident directors and managers, and hence the statement that the stock is paid up, is not an indication that can at all be relied upon as fixing the value of the stock. It is not a material representation, and hence not one which a party has a right to rely upon. The stock in a corporation is personal property, or a chose in action, according to some authorities, and I find no authority for putting the sale of stock upon grounds differing in any essential particular from the sale of a chattel. Fraud may exist by reason of false representations made by the seller to induce a purchaser to buy, as well in the sale of shares of stock, as in the sale of a horse. If A, B, and C own a horse, they may combine to make false representations as to his qualities and value, in order to induce some one to buy. If they do so, and thus induce some one to purchase, they will be liable for the fraud. If the purchaser is not moved to make the purchase by the false representations, or if the false representations are not made at all, he can not recover, simply because there was a combination, and intention to commit the fraud. There is a large class of cases where directors, and managers of corporations have been held liable for deceit in the sale of shares. In all of them there was a combination, a purpose formed to put the shares on the market, and dispose of them for a value they did not possess. But as far as my investigations have extended, and I have examined nearly all the

cases reported on this subject, the shares were put upon the market accompanied with false representations as to the business affairs of the corporation. False representations of the value of the property owned, the profits certainly to be realized, dividends already made, false entries upon the books of the corporation showing money, or property on hand, or false entries of subscriptions. In fact the cases present almost an endless list of means devised to deceive the public as to the value of shares. Such was the character of the case of *Cross* v. *Sackett*, 2 Bosw., 617, cited by the plaintiff. It is more nearly allied to the present case than any I have met with. There property was taken, and shares issued for it greatly in excess of its value. The corporation was known as the " Gold Hill Mining Company." The shares were accompanied in the market with false statements of the value of the property upon which the shares were based, as well as false statements of the dividends already earned, by reason of which statements the plaintiff had been induced to purchase stock, to his great damage. It was held that he could recover. *Bagshaw* v. *Seymour*, 93 Eng., C. L., 873; *Ball's case*, 22 Beav., 35; *Ayer's case*, 25 Beav., 515; *Duranty's case*, 26 Beav., 273; *Ross* v. *Estates Investment Co.*, L. R. 3 Eq. C., 122; *Worth's case*, 4 Drew, 529; *Gohard* v. *Bates*, 2 El. & Bl., 490; *Smith's case*, L. R., 2 Ch. App., 604; *Clark* v. *Dickson*, 6 C. B. N. s., 453; *Webster's case*, L. R., 2 Eq. Cases, 741; *Stewart's case*, L. R., 1 Ch. App., 574; *Henderson* v. *Lacon*, L. R., 5 Eq. Ca., 249, are English cases to the same purport, in all of which the offer of the shares for sale was accompanied with false representations.

Of American cases may be cited in the same connection, and the list might be almost indefinitely extended, are the following: *Robinson* v. *Smith et al*, 3 Paige, 221; *Cunningham* v. *Pell*, 5 Paige, 606; *Cazeaux* v. *Mali et al*, 25 Barb., 578; *Mayne* v. *Griswold*, 3 Sandf., 463; *Kimmel* v. *Stoner*, 18 Penn. St. R., 155; *Gifford* v. *Carvill*, 29 Cal., 589.

In this case there is an entire absence of any false state-ment as to the amount of property held by the corporation, or the business affairs of the company.   The shares bought by the plaintiff were offered in the market, and purchased by the plaintiff for fifty cents on the dollar..   At the time of the purchase the plaintiff asked the President of the Company where the money was to come from that they proposed expending in laying down the pipes, and he was informed that they had borrowed $100,000 to expend in laying down the mains.   This was after the completion of the fraud, if any had been perpetrated by the directors, and the case of *Mabey* v. *Adams*, 3 Bosworth, 346, is directly applicable. The complaint in that case was for false statements con-tained in the articles of association, and misrepresentations of the value of the stock made by the defendant, by which the purchaser was induced to buy.   It was held he could not recover by reason of false statements in the articles of asso-ciation, and as the other causes of complaint grew out of violations on the part of the defendant, as a director, of cer-tain provisions of the statute, by which the value of the stock was depreciated, all of which occurred prior to the purchase of the stock by the plaintiff, and it was held he could not recover, having become a purchaser after the offence was committed which depreciated the stock, and no fraudulent inducements having been held out to him to pur-chase.

The Court says:  " The fact that the stock which he pur-chased is less valuable than it otherwise would have been, constitutes no loss to him, since he must be presumed in the absence of any fraudulent inducement held out to him to purchase, to have given only what the stock was worth at the time.   If a man purchase a horse which has been injured in the hands of its owner, he certainly does not acquire by the purchase a right of action against the wrong-doer.   Such right belongs to him who owned the horse when the wrong
10

was committed, and does not pass with the horse to the purchaser. A man buys stock as he does every other kind of personal property, (under certain qualifications not necessary here to be stated,) at his own risk as to the quality."

In the same connection, I would call attention to the case of *Moffat & Curtis* v. *Winslow et al,* 7 Paige, 124.

In the absence, therefore, of any false representations by which the plaintiff was induced to make the purchase, after the stock had already been depreciated by the acts of the defendants, the demurrer is well taken to the evidence, and must be sustained.

NOTE.—This case was affirmed by the Court at General Term, March, 1873, without any opinion being filed.—[REPORTER.