G. and B. HALL, executors, &c. *appellants*, and O. PERKINS, *respondent*.

Where a *nephew*, a simple, ignorant young man, was induced by his uncle, an advocate (*par courtoisie*) in justices' courts, to accept a conveyance of land worth not to exceed $240 in satisfaction of a claim of at least $500, *it was held*, on an appeal from chancery, that from the nature of the transaction, the inadequacy of the consideration, the relative character, capacity and connection of the parties, *fraud and imposition* might well be *presumed;* and a decree directing the payment of the original claim by the uncle, and a reconveyance of the land by the nephew, was affirmed.

APPEAL from chancery. The respondent, in November, 1824, filed a bill in the equity court for the third circuit against the appellants, as executors of the last will and testament of Rowland Hall, deceased, stating substantially that when he was of the age of nine years, he was bound or placed by his father as an apprentice with Rowland Hall, his maternal grandfather, to learn the business of farming, whom he was to serve until he arrived to the age of 21, and that Rowland Hall on his part engaged to pay him, when he did arrive of age, the sum of $500. He averred that the agreement was reduced to writing, but that he never had the custody of it, and believed it to be lost or destroyed. He further alleged that he came of age on the 22d March, 1820, having faithfully performed his part of the contract, and that Rowland Hall died in the fall of 1820, leaving the $500 unpaid, and that the defendants are the executors of the will of Rowland Hall, and refuse to pay him. In the part of the bill in which the *pretences* of defendants are usually stated, the complainant alleged that the defendants pretended that the testator had sold and conveyed to him 40 acres of land in satisfac-

tion of his claim of $500, but he averred that if such deed was executed, it was the voluntary act of the testator to make him (the complainant,) without his request or desire, a voter at an election, and that such deed never was delivered to him. Another pretence charged in the bill to be set up by the defendants was, that the complainant had executed a receipt in full of all demands against the estate, as to which the complainant averred that if such receipt was in existence, it had been fraudulently and unjustly obtained; that a receipt had been given by him, but it did not relate to the subject matter of this suit.

The defendants answered admitting the agreement, the service of the complainant, and his arrival of age. As to the deed mentioned in the bill, they averred that on 26th April, 1820, the testator executed and delivered to the complainant a deed of 40 acres of land for the consideration of $500 expressed therein; that the complainant had repeatedly admitted that *he had not paid the consideration* expressed in the deed; that on 19th February, 1822, a settlement took place between Gideon Hall, one of the defendants, and the complainant relative to the claim of $500, and another claim of the complainant for nine months services subsequent to his arrival of age, and that it was then agreed that the consideration of $500 expressed in the deed *should be deemed a full payment* and satisfaction of the claim for services anterior to his arriving of age, and that certain notes and money should be received by the complainant in satisfaction of services performed after he arrived of age; and that in pursuance of such agreement, a receipt was given by the complainant, acknowledging to have received notes and cash to the amount of $39,48 in full of all debts, dues and demands against the estate. They averred that from the date of the deed to the complainant he had always been considered the owner of the forty acres, and claimed and exercised acts of ownership over it.

From the proofs, it appeared that the 26th April, 1820, was the second day of the *annual election* for state officers; the testator was warmly engaged in support of Mr. Clinton, who was voted for at that election as governor, and the tes-

ALBANY,
Dec. 1829.

Hall
v.
Perkins.

tator executed several deeds to several persons to enable them to vote, and among others to the complainant, who came into the house when the deed was executed and remained about five minutes. The deeds were not read by the parties, nor did either of them take possession of them. The deed to the complainant was produced ; it bore date 26th April, 1820, and conveyed 40 acres of land for the consideration of $500, (*acknowledged to have been received,*) reserving a rent. In September, 1820, the testator told a witness that he had given the complainant a lease of 40 acres ; that he had been a good boy to work ; that it was not all he meant to give him, *as he owed him* $500 *for his services ;* he meant to build a house on the lot and give him the rest of the mill lot and the mill. On the part of the defendants, it appeared that the complainant had admitted that he had agreed with the defendants to receive the 40 acre lot as a compensation for his services during his minority, and that they had executed a quit-claim of the lot to him, which was produced, bearing date 31st December, 1823, whereby the defendants released the lot for the consideration of *ten cents*, and which appeared to have been executed after the same had been surveyed under the direction of the parties, the boundaries in the deed of 1820 being alleged to be vague and indefinite. It further appeared that the complainant had admitted that he had settled with his uncle, Gideon Hall, and passed receipts in friendship, and his uncle had given him a watch. He however desired one of the witnesses to apply to his uncle to give him $500 or something in money for the land, as he did not like it. The 40 acres are rough, mountainous land, valued at from $4 to $9 per acre. The complainant is described as industrious, inoffensive, simple and ignorant ; the defendant, Gideon Hall, was said to practice *as an advocate* in justices' courts, having formerly himself been a justice of the peace.

The judge of the equity court, (the Hon. William A. Duer,) after a hearing on the pleadings and proofs, decreed an account to be taken of the amount due the complainant for his services during his minority. The defendants appealed to the court of chancery, and Chancellor Jones affirmed the decree and remanded the cause. On the coming in of the

report of the master allowing the $500 with interest, the defendants excepted, and the judge confirmed the report and decreed that the defendants pay the amount due, and that the complainant release the 40 acres. This decree was affirmed by Chancellor Walworth on appeal to him, and ordered to be carried into effect. From which decree an appeal was entered to this court, where the cause was argued by

*D. Gardner*, for appellants.

*J. L'Amoureux*, for respondent.

The following opinion was delivered by

Chief Justice SAVAGE. This is a short and simple case, addressing itself to the common sense and common justice of the plainest man, and seems to require no legal learning to decide it. The deed from the testator to the complainant when executed was a fraud upon the elective franchise; it conveyed no estate, for it was never delivered by the grantor. It was not considered by him as a compensation for services, for he spoke of it as a gift, and at the same time admitted he owed the complainant $500. There can be no dispute that at the death of Rowland Hall the estate honestly owed Perkins $500. How has this acknowledged debt of $500 been paid? I answer by compelling or persuading this simple and ignorant young man to receive the 40 acres of rocks in compensation for his services. The land is estimated by some of the witnesses at $4, and by others at eight or nine dollars; a fair medium is $6. We may therefore consider the land worth $6 per acre, amounting to $240, which these uncles gave their nephew instead of $500 and about two years interest.

It is said that inadequacy alone is no evidence of fraud. It has indeed been so decided; but inadequacy does not here stand alone. The contracting parties and their capacities should also be considered: on the one side, a simple uneducated boy, who knew only how to work on a farm; on the other, a man who had been a justice of the peace, and therefore may be presumed to have some knowledge of law. He was

no longer a justice, but his practice was that of advocating causes before justices, and probably he was not unacquainted with the tricks and quibbles which too often disgrace inferior tribunals, and bring a reproach upon that branch of our jurisprudence. The inadequacy then consists, 1. In conveying 40 acres of mountain rocks, worth $240, in satisfaction of a debt of about $565, much less than half; 2. One of the contracting parties arrived at mature age, perfectly acquainted with the value of property, and from his very "vocation," in the habit of taking every advantage which the law would permit: the other an ignorant, simple, unsuspecting boy, unacquainted with property and with the arts and intrigues which too often attend more advanced age; 3. On the one side the uncle, and the other the nephew. The grandfather had hitherto been the guardian and guide of the complainant; and after his decease, to whom could this ignorant youth more naturally look for advice and protection than to his mother's brother, the executor of his grandfather's will, as one every way capable of advising him? The result, however, shews that there was some reason in the ancient law which refused to relations, who might inherit from minors, the guardianship of their persons, because it was, as Lord Coke says, "*quasi agnum lupo committere ad devorandum.*" I have thus far cited no authority; it seems to me that none can be necessary beyond an appeal to the moral sense.

It is contended by the appellants that there is not in the bill a sufficient allegation of fraud to justify the admission of evidence on that subject, and if there be a sufficient allegation, there is no evidence of fraud. The bill charges, that if the defendants should produce a receipt in full from the complainant, that such receipt was fraudulently and unjustly obtained. This is sufficient. The ground of the plaintiff's claim was matter of contract, and he resorted to a court of equity because the written contract signed by Rowland Hall was lost or destroyed; the allegation of fraud was in anticipation of the defence contemplated, and it seems to me when thus set up, it need not be so full as if made the substantive ground of complaint. Had the plaintiff below been in possession of the written contract, he might have sued in

a court of law, and the question of fraud might have been enquired into in rebutting the defence.

Fraud is often the subject of enquiry in a court of law as well as in equity; there is this difference however, that at law fraud must be proved; it must be what Lord Hardwicke calls *dolus malus,* actual fraud arising from facts and circumstances of imposition. At law, the contract of every man who is *compos mentis,* is binding and cannot be avoided in general without proof of actual fraud in obtaining it. Neither will a court of equity measure the extent of men's understandings and say that there is an equitable incapacity where there is a legal capacity; yet if a weak man gives a bond for a pretended consideration, when in truth there was none or not near so much as is pretended, equity will relieve against it. (3 P. W. 130, 1.) Fraud is sometimes also apparent from the intrinsic nature of the contract. It may be such as no man in his senses and not under delusion would make, and such as no honest and fair man would accept, which is Lord Hardwicke's second class of frauds; and his third is that which may be presumed from the circumstances and condition of the parties contracting. (2 Vessey, sen. 155, 6.)

This case partakes of both the two last classes of frauds, if not of the first. Here was a contract made which no sensible man not under delusion would make on the one hand, and which no man who had not lost all the consciousness of shame would accept on the other. One of the parties was a weak boy, the other a man of capacity, who may be presumed from the circumstances of this case, an artful intriguer in small matters. It was a contract made by an unsuspecting youth with a man in whom, from the connexion existing between them, he must have reposed confidence, and to whom he naturally looked for advice and protection. It is clearly a case, therefore, where from the nature of the transaction and the situation of the parties, fraud and imposition are to be presumed. (4 Cowen, 220.)

I am of opinion the decree of his honor the chancellor should be affirmed with costs.

Mr. Senator S. ALLEN also delivered an opinion in favor of an affirmance of the decree.

And this being the unanimous opinion of the court, the decree of the chancellor was accordingly affirmed, with costs to be paid by the appellants.